IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SUZETTE HOPPER,<br><br>   Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of the Social Security Administration,<br><br>   Defendant. | CASE NO. 8:09CV383<br><br>MEMORANDUM<br>AND ORDER |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.*  The Court has carefully considered the record and the parties' briefs (Filing Nos. 19, 24).

## PROCEDURAL BACKGROUND

The Plaintiff, Suzette Hopper, filed for disability and SSI benefits on April 21, 2006. (Tr. 52-54, 361-67.)  The claims were denied initially and on reconsideration. (Tr. 69-80.)  An administrative hearing was held before Administrative Law Judge ("ALJ") James Francis Gillett on November 5, 2008.  (Tr. 374.)  On April 22, 2009, the ALJ issued a decision finding that Hopper is not "disabled" within the meaning of the Act and therefore is not eligible for disability or SSI benefits.  (Tr. 27.)  On August 21, 2009, the Appeals Council denied Hopper's request for review.  (Tr. 6-10.)  Hopper now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").

Hopper claims that the ALJ's decision was incorrect because: 1) the ALJ failed to conclude that Hopper's weight loss impairment meets Listing 5.08; 2) the ALJ improperly relied on the evaluation of Roy W. Holeyfield, Jr., M.D., a consultative physician; and 3) the ALJ erred in not crediting Hopper's testimony.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole. Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

*Pre-Hearing Documentary Evidence*

The record shows that in December 2004, Hopper went to the Midlands Community Hospital with complaints of right flank pain and hematuria. Hopper reported that she had a kidney removed at age eight due to cancer, but she reported no significant kidney problems since then. (Tr. 155.) Testing revealed renal insufficiency, and Hopper was transferred to the University hospital. (Tr. 156-57.) Hopper's right kidney was drained. (Tr. 179.) During a followup visit in January 2005, Hopper reported she was "feeling well." (Tr. 228.)

In May 2005, Hopper saw urologist Larry Siref, M.D., with complaints of persistent low back pain. Dr. Siref did not think her pain was related to her kidney problems, and he recommended that she follow up with her primary care physician. (Tr. 254.) In June 2005, Hopper saw her primary care physician, Kimberly Jarzynka, M.D., complaining of chronic low back pain. (Tr. 244.) On examination, Hopper had decreased range of motion in her back, but straight-leg raises were negative for pain. (Tr. 245.) X-rays of her upper lumbar

spine showed early degenerative changes. (Tr. 246.) Dr. Jarzynka recommended physical therapy and told Hopper to take Tylenol as needed for pain. (Tr. 245.)

In July 2005, Hopper began physical therapy to treat her low back pain. (Tr. 231-32.) Later that month, however, Hopper told Dr. Jarzynka that she did not return to physical therapy after her first visit, and that she was not doing the recommended exercises because they caused pain. Dr. Jarzynka recommended that Hopper continue with physical therapy. (Tr. 243.) In August 2005, Hopper was discharged from physical therapy because she did not make any more appointments or contact the therapist after her initial visit. (Tr. 230.)

In May 2006, Hopper returned to Dr. Jarzynka with low back pain that reportedly began after her kidney was drained in December 2004. She said physical therapy[1] had not helped. On examination, Hopper's back was tender but straight-leg raises were negative. Hopper denied any weakness or tingling in her legs, and her bowel and bladder functions were normal. (Tr. 239.) Dr. Jarzynka assessed chronic low back pain and prescribed regular Tylenol and amitriptyline. (Tr. 239-40.)

In June 2006, Hopper saw Susan Polack, P.A.C., for a cold that resulted in a diagnosis of possible sinusitis. Significantly, Ms. Polack described Hopper as a "well-nourished thin white female in no apparent distress." (Tr. 238.) Ms. Polack prescribed Zithromax for Hopper's cold symptoms. (Tr. 238.)

In June 2006, state agency physician Glen Knosp, M.D., opined, based on his record review, that Hopper could perform a full range of light work despite her kidney

---

[1]As stated, Hopper attended only one session of physical therapy.

problems. (Tr. 144-51.) Dr. Knosp concluded that Hopper's self-reported functional limitations were not supported by the record. (Tr. 149.)

In July 2006, Hopper returned to Ms. Polack for a routine examination. She reported having chronic pelvic pain that radiated to her back, and she stated she treated her pain by drinking up to five beers daily. (Tr. 236.) Ms. Polack declined Hopper's request for narcotics and recommended a pelvic ultrasound. (Tr. 237.)

In February 2007, Hopper saw John L. Smith, M.D., for evaluation. Dr. Smith described Hopper on examination as "quite comfortable and relaxed." (Tr. 278.) Hopper reported having "pains" in her chest or gastric area. Dr. Smith stated that her pain could be investigated, but Hopper declined treatment due to her lack of insurance coverage and stated that she merely wanted to make a record of her complaints. (Tr. 278-79.)

In January and February 2008, Hopper saw Dr. Jarzynka with complaints of abdominal pain, fatigue, irritability, and depression. (Tr. 275, 325.) Dr. Jarzynka prescribed Zoloft for Hopper's mood and Omeprazole for her abdominal pain and reflux symptoms. (Tr. 276.) In March 2008, Hopper returned to Dr. Jarzynka for followup regarding her depression. (Tr. 273.) She reported that Zoloft had significantly helped her mood, her reflux was better, and her appetite had improved "a bit." (Tr. 273-74.) The examination was essentially normal, except for bronchitis and palpitations that were evaluated with a heart monitor. (Tr. 273.) The monitor revealed some occasional premature ventricular contractions and isolated premature atrial contractions. (Tr. 25, 318.) Hopper complained of spotting before her periods, yet she declined a pelvic examination. Dr. Jarzynka recommended that Hopper that she obtain an endometrial biopsy, a pelvic examination, and a Pap smear. In April 2008, Hopper returned to Dr. Jarzynka for

4

numerous complaints. Despite her wheezing, Hopper had not filled her inhaler. Hopper reported having recurrent gallbladder attacks after eating "fatty foods." (Tr. 271.) She also noted that she had been active and that her weight had decreased. (Tr. 271.) On examination, Hopper's abdomen was soft and nondistended, and she had positive bowel sounds. Dr. Jarzynka described Hopper's gallbladder attacks as "self-limiting," and she recommended that Hopper treat them by avoiding fatty and bothersome foods. Dr. Jarzynka again recommended that Hopper obtain an endometrial biopsy.[2] (Tr. 272.)

Also in April 2008, Hopper saw Michael Griess, M.D., with complaints of a gradual decrease in vision in her right eye. An examination revealed Hopper had only 20/200 vision in her right eye due to a cataract. (Tr. 287.) Dr. Griess recommended cataract surgery, and he offered to provide her with a referral for financial assistance for the surgery. (Tr. 287-88.) In May 2008, Hopper returned to Dr. Siref, and he described Hopper's kidney issues as "relatively stable." (Tr. 298.) Although Dr. Siref acknowledged that Hopper had lost some weight with nausea and vomiting and had gallstones, he stated that she was "doing fine from a urological standpoint." (Tr. 298.) In September 2008, Hopper returned to Dr. Siref with complaints of "flank pain and a history of numerous issues including weight loss and just [an] ill feeling." (Tr. 308.) Dr. Siref again stated that Hopper's problems were not urologically related, but he was concerned about her weight loss and recommended that she see her primary care physician. (Tr. 308.)

---

[2] According to the record, Hopper never had the twice-recommended biopsy. (Tr. 388.)

5

*Hopper's Testimony*

On November 5, 2008, Hopper testified at her administrative hearing held before the ALJ. Hopper testified she finished high school and while there she had some special education classes. (Tr. 379.) She had trouble reading due to comprehension and vision. (Tr. 379-80.) She stated she had arthritis-like pain in her left shoulder. She recalled that her disability began with her hospitalization in December 2004. (Tr. 381.) Hopper's husband supported her with earnings from a temporary job, and their twenty-year old daughter lived with them in their apartment. They received food stamps. Her daughter did not work and just "[took] care of" Hopper. (Tr. 381-82.)

Hopper testified that she stopped drinking in January 2008. She said she weighed 80 pounds and stood four feet and eleven inches tall. (Tr. 383-84.) Hopper testified that in January 2008, she weighed 88 pounds. Hopper testified that she had been seeing a nutritionist, Lisa, who is a P.A.C. with Dr. Jarzynka, during the two months prior to the hearing. (Tr. 384, 398.) Hopper testified that she followed the diet given to her for two months, yet she continued to lose weight. Hopper stated she had gallstones and stomach pains that she described as cramping, bloating, and sharp pains that come and go. (Tr. 385.) She stated that the stomach pains did not appear related to anything in particular, varied in length but lasted up to twenty minutes, and caused her to eat less. (Tr. 386.) Hopper testified that she also had constant, daily kidney pain that she said was in her kidney area and back. She could not associate increased kidney pain with any triggering factors. She also complained of frequent headaches and urination. She described frequent urination as voiding twelve times daily, sometimes without warning and resulting in accidents. She described her urination as sometimes painful. She testified that she

experienced bad headaches daily. She took aspirin for her headaches and lay down for about an hour, adding that she did not take anything stronger because of her kidney. (Tr. 387-88, 390-91.) Hopper testified that she had the recommended endometrial biopsy at the University of Nebraska Medical Center on her OB/Gyn doctor's order, yet she did not know the results. The record does not include any report or other reference to a biopsy. (Tr. 388-89.) She noted her vision problems due to her cataract, but she had not had the surgery because she was afraid to do so. (Tr. 392.) Hopper referred to her depression, noting that her medication was changed from Zoloft to Citalopram because the Zoloft caused racing thoughts. Although she stated the Citalopram helped her depression, she said she still had days when she was moody and crying. (Tr. 394.) Hopper felt she was under a lot of stress due to her pain and the effect it had on her life, yet she acknowledged she had not sen a counselor as recommended by Dr. Jarzynka because of transportation problems. (Tr. 395.) Hopper last drove four months prior to the hearing, and she said she could no longer drive due to chronic pain and vision problems. Hopper also testified that she experienced daily pain, that she associated with her heart, radiating from under her left armpit into the fingers on her left hand. (Tr. 396.) Hopper could not associate her heart palpitations with any particular triggering factors. (Tr. 397.) Hopper stated that eating fatty foods caused gallstone attacks, though she also stated that she was recently having weekly attacks when she had not eaten anything. She testified she was seeing a nutritionist and avoiding fried and fatty foods. (Tr. 398.) She used a heating pad for her back and kidney pain, rubbed her kidney area, and used a topical cream on her shoulder. (Tr. 398-99.) She used the heating pad in a seated position and while lying down. At the hearing she used a cushion behind her back for comfort and to help her pain. (Tr. 399.)

Hopper also testified that she got up and moved around, or paced, to help her pain. She stated that she did this throughout each day. (Tr. 400.)

Hopper testified that her daughter cooked and cleaned. Hopper shopped once a month for groceries after she received food stamps, and her husband and daughter did any other necessary shopping. When she shopped, she did not lift or carry. (Tr. 400.)

Hopper clarified that when she worked for three months at a Payless shoe store, she worked thirty-two hours per week and not two hours as reported in the written answers to interrogatories. (Tr. 400-01.) She was a sales associate, and she also stocked shoes and unloaded boxes and crates. She used a ladder. This job lasted three months and ended in December 2004. Immediately prior to the Payless job, she worked in a school cafeteria. (Tr. 401.) There she was a lunch food server for four hours daily. (Tr. 402.) Before working at the school cafeteria, Hopper worked part-time at a Baker's grocery store deli counter. (Tr. 402-03.) Hopper was also a cashier at Family Dollar for two weeks in 1997. (Tr. 403.) At some point she worked at an insurance company. (Tr. 402.)

Hopper testified that she used an Advair inhaler twice daily, which caused her to be shaky and dizzy for half the day due to a sulfa allergy. (Tr. 403.) Hopper stated that Dr. Jarzynka recommended that she see a dentist. (Tr. 405.) However, Hopper said it had been "a while" since she had seen a dentist. (Tr. 404.)

The ALJ ordered Hopper to go for a consultative examination with an internist after the hearing. (Tr. 405-06, 418.)

*Vocational Expert's Testimony*

The ALJ asked the vocational expert ("VE") to consider a hypothetical claimant of Hopper's age, education, and work experience, who generally could perform sedentary work. (Tr. 407-08.) The ALJ noted, however: the claimant could not push or pull levers repeatedly with her legs; she could twist, bend, turn, stoop, and squat only occasionally; and could not crawl, kneel, use vibrating tools or motor vehicles, work with small objects the size of pea, or work around unprotected heights, extreme temperatures, or hazards. (Tr. 408-10.) Finally, the ALJ noted that, while seated, the claimant would need to stand for five of every thirty minutes. (Tr. 411.) The VE responded that such a claimant could work as a sedentary food and beverage order clerk (27,600 jobs nationally; 230 in Nebraska; 1,600 in the immediate four-state region), and packager (25,000 sedentary jobs nationally; 100 in Nebraska; 700 in the immediate four-state region). (Tr. 411-12.) Assembly jobs were eliminated due to Hopper's eyesight. (Tr. 412.)

A second hypothetical was posed that included the limitations set out in the first hypothetical. Also included were five-minute bathroom breaks once in the morning and once in the afternoon in additional to normal breaks. With this addition, the VE opined that the claimant could not perform any jobs. (Tr. 413.)

In the third hypothetical, in addition to the limitations in the first hypothetical, the VE was asked to assume the claimant had back and kidney pain requiring her to lie down for an hour each day at a time other than normal breaks. With these limitations, the VE opined that the claimant could not perform any jobs. (Tr. 413.)

9

*Post-Hearing Consultative Examination*

Roy W. Holeyfield, Jr., M.D., examined Hopper on December 3, 2008, as the ALJ ordered. Hopper complained of kidney pain and shortness of breath requiring use of her inhaler. It was noted that Hopper had been around second-hand smoke all her life as her family members, including her husband, smoked. Hopper also described headaches lasting three or four hours for which she took aspirin. Last, she complained of daily fatigue that she attributed to her pain. (Tr. 345-46.) Her height was recorded as five feet, and her weight was 79 pounds. Dr. Holeyfield described her as "rather frail-appearing and cachectic" and "modestly anxious." (Tr. 347.)

Dr. Holeyfield's examination revealed anxiousness, moderate lumbosacral spine tenderness, and significant weight loss marked by a protruding thoracic and lumbar spine. (Filing No. 347.) Otherwise, the examination was normal. Dr. Holeyfield assessed Hopper with: chronic, bilateral low back pain; right-sided "kidney" pain; emphysema secondary to secondhand smoke; chronic headaches, most likely migraines secondary to stress and anxiety; fatigue; and anxiety. (Tr. 348-49.) He thought her self-described "kidney" pain might be muscular. (Tr. 348.)

Regarding lifting and carrying, Dr. Holeyfield stated that Hopper could lift and carry up to ten or fifteen pounds on a constant basis, but he stated this would best be done while sitting. He opined that she could lift between twenty and twenty-five pounds on an occasional basis. He had no concerns regarding Hopper's ability to handle objects, see, hear, or speak. He recommended standing or walking only up to ten or fifteen minutes hourly. He saw no limitations with sitting, but he recommended changing position for ten minutes for each hour of sitting if Hopper sits for more than one hour. He recommended

no stooping, climbing, kneeling, or crawling. (Tr. 348-49.) He recommended no exposure to hazards such as dust, fumes, extreme temperatures. Finally, Dr. Holeyfield noted that although anxiety and depression were not a part of the examination, Hopper had difficulty with social interactions and therefore might have problems relating to other employees. (Tr. 349.)

Dr. Holeyfield also completed a medical source statement, in the form of a checklist, based on his one-time examination reflecting that Hopper could: lift and carry up to ten pounds on an occasional basis; never lift or carry more than ten pounds; sit, stand, and walk only two hours each in an eight-hour work day and not for longer than fifteen minutes at a time. (Tr. 350-51.) He allowed for occasional climbing and stooping. (Tr. 353.)

The ALJ sent Dr. Holeyfield a followup letter asking him to clarify some inconsistencies between his report and completed medical source statement. In his response, Dr. Holeyfield: described Hopper as "frail and cachectic"; clarified that Hopper could lift between twenty and twenty-five pounds on an occasional basis; and appeared to opine that Hopper could not work an eight-hour day because she was "frail and cachectic" and had back pain. (Tr. 357.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[3] the ALJ concluded that Hopper was not disabled in either the disability or the SSI context. (Tr. 27.) Specifically, at step one the ALJ found that Hopper had not

---

[3]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits. For simplicity, in making further references to the social security regulations the Court will only refer to their disability regulations.

11

performed substantial gainful work activity since December 8, 2004. (Tr. 18.) At step two, the ALJ found that Hopper had the following medically determinable "severe" impairments:

> Solitary kidney, status post left nephrectomy for Wilms tumor at age eight; acute renal failure in December 2004, with residual fatigue; right hydronephrosis (swelling of the kidney due to a backup of urine); displaced right kidney; vision loss, with cataracts; left shoulder pain; depression; alcohol consumption; and cholelithiasis (gallstones).

(Tr. 18.)

The ALJ found that "[t]hese impairments interfere more than minimally" with Hopper's ability to perform basic work related functions. The ALJ noted that because Hopper's back pain had not interfered with her ability to work for at least twelve continuous months, her back impairment was not considered "severe." (Tr. 19.)

At step three, the ALJ discussed Hopper's impairments in detail. He found that her weight loss of December 2008 resulting in a body weight of 79 pounds with a height of five feet "appears to approach" Listing 5.08.[4] The ALJ found that Hopper's medically determinable impairments, either singly or collectively, did not meet section 12.04 or any other section of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. 23-24.) The ALJ noted that cataract surgery was an option, but Hopper had not pursued surgery out of fear. He noted that her left shoulder pain was not associated with a nonunion of a fracture or other condition set out in a musculoskeletal listing. The ALJ found that Hopper's mental impairments did not equal Listings 12.04 (Affective Disorders) or 12.09 (Substance Addiction Disorders). The ALJ explained his finding that her mental impairments did not meet the requirements of

---

[4]Listing 5.08, describing the impairment of weight loss, is quoted in the Discussion section of this memorandum and order.

12

"paragraph B,"[5] which requires that mental impairments result in at least two of the following: marked restrictions of daily living activities; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of which must be of extended duration. Listing 12.04, ¶ B. The ALJ noted that a "marked" limitation is defined as more than moderate but less than extreme.[6] He also referred to the definition of "repeated episodes" of extended duration as three episodes within one year, or an average of one every four months, with each episode lasting for at least two weeks.[7] The ALJ reasoned that Hopper had none-to-mild restriction in daily living activities and any limitations were due to physical rather than mental conditions. He noted that she showed, at the most, mild difficulties in social functioning. The ALJ noted mild to moderate difficulties in Hopper's concentration, adding that she had not had episodes of extended duration that met the criteria of Listing 12.00(C)(4). The ALJ also found that Listing 12.04(C) was not satisfied.[8]

---

[5]Listing 12.04 may be met by meeting the requirements of paragraph A and B, or C, of Listing 12.04.

[6]A "marked" limitation is defined at 18 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C).

[7]The applicable social security regulation recites the definition used by the ALJ. Also, the regulation states: "If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 18 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4).

[8]Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," together with: repeated episodes of decompensation, each of extended duration; a residual disease process that would

With respect to step four, the ALJ determined that Hopper could not have sufficient RFC to perform her past relevant work because she had no past relevant work.

At step five, the ALJ found that Hopper had the residual functional capacity to perform sedentary work with detailed limitations relating to: pushing and pulling; bending, twisting, turning, crawling, kneeling, stooping, squatting, and stair climbing; vibrating tools; operation of vehicles; unprotected heights; temperature and humidity; environment; vision; standing and sitting; and understanding or making judgments in complex work-related decisions. The ALJ's opinion included an in-depth analysis of Hopper's testimony, as well as the documentary evidence including reports of treating physicians and state agency physicians. The ALJ gave great weight to the opinions of Dr. Holeyfield, the consultative physician who evaluated Hopper after the hearing.

For these reasons, the ALJ concluded that Hopper was not disabled.

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995). Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision. *Harris,* 45 F.3d at 1193.

---

cause decompensation by even a minimal increase in mental demands or environmental change; or current history of inability to function outside a highly supportive living arrangement lasting at least one year with a continued need for such an arrangement. 18 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(C)(4).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Id.* As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### *Listing 5.08*

Hopper argues that the ALJ erred in finding that her weight loss did not meet or equal the criteria set out in Listing 5.08 and also that her weight loss did not meet the durational requirement, because her weight had been persistently low since 2004.

Listing 5.08 provides: "*Weight loss due to any digestive disorder* despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period." 18 C.F.R. Part 404, Subpart P, Appendix 1, § 5.08. Digestive disorders include: "gastrointestinal hemorrhage, hepatic (liver) dysfunction, inflammatory bowel disease, short bowel syndrome, and malnutrition." 18 C.F.R. Part 404, Subpart P, Appendix 1, § 5.00(A).

Hopper has the burden of showing that she meets the listing. *Carlson v. Astrue,* 604 F.3d 589, 593 (8th Cir. 2010). In order to "'meet a listing, an impairment must meet all of

the listing's specified criteria.'" *Id.* (quoting *Johnson v. Barnhart,* 390 F.3d 1067, 1070 (8th Cir. 2004)).

Hopper failed to show that her weight loss resulted form a digestive disorder. The record includes no medical opinions stating that her weight loss was attributable to a digestive disorder. Rather, the record indicates that her weight loss stemmed from stress and anxiety. Therefore, Hopper cannot meet the requirements of Listing 5.08. *Id.* (stating that the ALJ's decision that the claimant did not meet Listing 5.08 was supported by substantial evidence where the claimant did not show weight loss attributable to a gastrointestinal disorder).

Because Hopper cannot satisfy this requirement of Listing 5.08, the Court declines to address the parties' arguments regarding the duration of her weight loss and low body mass index. The ALJ's finding that Hopper did not meet Listing 5.08 is supported by substantial evidence.

### *Dr. Holeyfield's Opinion/Residual Functional Capacity*

Hopper argues that the ALJ improperly relied on Dr. Holeyfield's opinion because it was based on a one-time examination and because his narrative opinion was inconsistent with the medical source statement that he completed with respect to Hopper's ability to work.

An ALJ must view the record as a whole in determining whether a treating physician's opinions are consistent with the evidence. "'A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.'" *Travis v. Astrue,* 477 F.3d 1037, 1041 (8th Cir. 2007) (quoting *Hacker v. Barnhart,* 459 F.3d 934, 936 (8th Cir.

2006)). An ALJ may choose not to accord weight to a treating physician's statement. A physician's opinion not supported by objective medical evidence does not support a disability finding. *Id.*

Viewing the record as a whole, it is helpful to have Dr. Holeyfield's recent and complete evaluation. As discussed below, Hopper's testimony is inconsistent with evidence in the record. Although she saw several doctors, Hopper often did not follow through with treatment recommendations, or was noncompliant with treatment, and never sought treatment for her alleged depression.[9] Therefore, her treating doctors' opinions are of limited use and the impairments that Hopper elected not to treat do not appear to be severe.

The ALJ did not completely discount the treating physicians' opinions. For example, he considered Dr. Siref's May 2008 opinion that Hopper's kidney issues were stable and she was fine urologically and Dr. Jarzynka's April 2008 statement that Hopper's gallbladder attacks were "self-limiting" and could be avoided by not eating fatty foods. Moreover, neither Dr. Siref nor Dr. Jarzynka opined that Hopper was disabled or could not perform sedentary work.

The ALJ also gave weight to the opinions of state agency physicians Glen Knosp, M.D. and N.E. Harley, M.D. Both doctors agreed that Hopper could do a full range of light work.

The ALJ properly gave "great weight" to Dr. Holeyfield's opinion. At the ALJ's request, Dr. Holeyfield clarified relevant inconsistencies. Substantial evidence supports

---

[9]Hopper has not challenged the ALJ's assessment of her mental limitations.

the ALJ's decision that Hopper has the RFC to perform sedentary work with the exceptions detailed by the ALJ.

***Claimant's Credibility***

Hopper argues that the ALJ discounted her testimony. Specifically, Hopper argues that the ALJ's statement that her weight loss and fatigue might be related to alcohol consumption and appears to be related to stress is not supported by the record. Hopper also argues that if the ALJ believed that alcohol was a factor he should have followed a prescribed analysis.

In evaluating subjective complaints, an ALJ must consider: a claimant's prior work history; the duration, frequency, and intensity of the alleged pain; the effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions. *Medhaug v. Astrue,* 578 F.3d 805, 816 (8th Cir. 2009) (quoting *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). If an ALJ discredits a claimant's testimony and states a reasoned basis for doing so, generally the ALJ's credibility determination is respected. *Jones v. Astrue,* 619 F.3d 963, 975 (8th Cir. 2010).

In this case, the ALJ very carefully evaluated Hopper's complaints of pain. He summarized the medical evidence in detail. He noted that she has not been compliant with recommended courses of treatment and has not sought treatment for some of her complaints, including depression. He referred to her diet being the cause of her gallbladder attacks. He recognized that Hopper's medical conditions caused functional limitations, but he concluded that based on the record as a whole her symptoms and limitations were not as severe as she alleged.

The Court agrees with the ALJ's analysis. The ALJ's reference to alcohol as a possible cause for some of her complaints is inconsequential to this Court's analysis. The Court particularly notes the frequency with which Hopper did not continue or seek treatment, pursue further treatment upon her doctor's recommendation, or continue physical therapy beyond one visit. The record does not support Hopper's subjective complaints.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the Defendant will be entered in a separate document.

DATED this 4th day of November, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge